## GLENDY BURKE *v.* VINCENT MURPHY et al.

In the year 1840, the appellee M. was much involved in debt, and there were two judgments against him, one held by P. for $11,974.24 with interest thereon, subject to a credit of about $2,600, and the other was held by C. for $1,655 with interest, and said M. was also indebted to B. in a sum for which a judgment was afterwards rendered against him for $11,907.67. M. was the owner and in possession of a plantation of 1,518 acres of land, and about forty slaves, farming utensils, stock, &c.; and in December, 1840, P. and W. met at the house of M., when W. purchased the judgment of P. against M., paying him (P.) about $2,000 in cash, and giving his individual notes for the balance, one for $4,100, due twelve months after date, and another for $4,428, due two years after date, which notes were afterwards secured by a deed of trust upon the slaves purchased under the judgment, and also another note signed by W. and M., payable at the Commercial Bank of Natchez for $4,000. The money in payment of these notes was received from W., but not until the fall of 1846 was the whole amount paid, and it is said the name of M. was put to the note payable in bank, because the bank rules required several names on paper. It is also stated that the transfer of the judgment was suggested by P. because he was apprehensive the property might be run off; and this is P.'s statement of the matter, which in many respects is not reconcilable consistently with the facts of the case; and it seems that the money paid and secured to him (P.) is considerably more than was due on the judgment; besides it is shown that no such note as the one mentioned with M.'s name on it was ever discounted at the Commercial Bank, but that a note for $3,000 was, in March, 1840, discounted there for the benefit of M., the avails of which were paid to P., and no other note with the name of M. on it was ever discounted at the bank, as the books show; and M. having then supplied the means in part by which the judgment was paid of P. against M., and which was assigned by P. to W. *Held,* that the transfer of the judgment by P. to W. and the proceedings under it cannot be permitted to stand; and the law condemns it as fraudulent as to M.'s creditors.

Whatever is fraudulent in an essential part, is fraudulent *in toto* as to the creditors of the party conveying.

Burke *v.* Murphy et al.

If a transaction is condemned under the force of legal rules, it cannot receive a
more favorable consideration in a court of equity on account of any hardship
it may work to the party.

The circumstances connected with the sale of the land, cast suspicion upon that
also, and force the conclusion that the sale partakes of the same vicious
character as the sale of the personal property did, and it is *held* void as to
M.'s creditors.

On appeal from the superior court of chancery; Hon. Charles
Scott, chancellor.

This was a bill filed in the superior court of chancery, by
Glendy Burke, complainant, showing that on the 20th June, A. D.
1845, he recovered judgment in the circuit court of Hinds county
against Vincent Murphy and Wm. H. Hamer for $11,807.67,
and that an execution has been returned *nulla bona*; notwith-
standing which, the defendants in said judgment, ever since the
rendition of the same, have had large estates, and the use and
enjoyment of the same, which have been protected from levy by
fraudulent conveyances of the legal title; demands discovery of
what property defendants own.

That Vincent Murphy, at the date of said judgment, had in
possession a plantation in Hinds county, of 1,518 acres, and at
least thirty-seven negroes, stock, &c., files schedule A. of the
property.   That Murphy lived on the plantation before the said
judgment, and yet lives there, managing and controlling the same
with the negroes, &c., as his own.   That said estate, for many
years previous to 1841, was the property of Murphy; but in said
year 1841, by an arrangement between said Murphy and John
F. Watson, a near relation, the said land and slaves were sold
by the sheriff and nominally purchased by Watson for himself,
but really for Murphy, which was done to hinder and delay
creditors.   That Watson pretends to have made said purchase
under judgments in favor of Hoopes & Bogart, and Alexander
Rymes, use of Reuben Collins, against said Murphy; the first
of which was rendered 2d June, 1837, and the last on the 17th
October, 1840.   That the whole amount bid for the land, by
Watson, was $500.   That previous to said sales, Watson, for
the use and benefit of, and in trust for Murphy, purchased said
judgments, or made some arrangement for them, by which he

Burke *v.* Murphy et al.

gave his own notes, payable in instalments to one A. W. Put-nam, the assignee of the Hoopes and Bogart judgment, which notes were to be, and were in fact, paid out of the proceeds of said Murphy's estate. That said purchases were colorable and made for Murphy, who before and since was and is, the true owner of said property. That at the time of said sales, there was on said plantation a large amount of stock, plantation tools, provisions, corn, &c. That Murphy remained upon the place controlling and managing it as his own, and enjoying its proceeds. That Watson did not purchase any of the stock, and other things, and set up no claim to them, but they were used and consumed on the place, and employed in the produc-tion of cotton, with which to pay said debts to Hoopes & Bogart, and Reuben Collins. That Murphy has employed the overseers, and had the benefit of the property, and that the debt contracted by Watson for said Murphy has long since been paid. That since 1841, Murphy has made crops of great value, more than sufficient to pay and satisfy said two judgments, and they have been partly applied in that way. That Watson and Murphy ought to be compelled to disclose what property was on said plantation at the time of said sales, and not sold, and what use and disposition has been made of the same; what contract, agreement, or understanding, ever existed between them; what payments Watson has made; what have been the products of the estate, and how applied: what Watson agreed to give for said judgments; and what object he had in view in purchasing the same; what conversation he and Murphy had about said purchase; what disposition was to be made of said property after paying the amount due on said judg-ments; whether Watson was to have the property as his own; and whether Murphy was not to have some interest, and what? Whether $12,130 was the full and fair value of said land and slaves, in January, 1841, or what they were worth? That the prices at which said land and slaves were sold were merely nominal; that the sales were gotten up and man-aged by Watson and Murphy, to protect the property from creditors.

The answer of Vincent Murphy, admits the recovery of the

VOL. V.                         15

judgment of complainant, as alleged, and the *nulla bona*. Denies that at the date of said judgment, or since, or now, he has had, or has large and valuable estates, consisting of lands, slaves, and stock of every description, usually found on cotton plantations, and the use and benefit and enjoyment of the same. He is not the owner, nor in possession of any such property as alleged by complainant; his whole estate having been, long before complainant's judgment, sold under older judgments. It is untrue, that the estate referred to and alleged to be owned by respondent, has been covered and protected, by certain conveyances of the legal title, made with the express view to hinder, delay, and defraud complainant of his debt and judgment; that he has not made such conveyances, nor has any one for him, or at his instance, or with means advanced by him. His whole property had been sold under execution before the rendition of complainant's judgment. Since the year 1841, when his property was sold, he has not owned in his own, or any one else's name, any property subject to levy and sale, except an acre or two on Biloxi Bay, which he sold in 1847. Denies that at the date of plaintiff's judgment, he had in his possession in Hinds county, a plantation and thirty-seven negroes, (or any other number,) besides stock usually found on cotton plantations, or any property save such as every citizen is entitled to hold, free from execution, except the lot mentioned; he had no real or personal estate owned by him, or held in any one else's name. At the date of said judgment, and before and since, he has resided with his family on the plantation formerly owned by him, and which he presumes to be the one alluded to by complainant, though not now living there. The negroes and stock formerly owned by him and sold as aforesaid, in 1841, except such as have died since, and two or three sold by Watson, are still on the place, but respondent denies that he manages and controls said plantation, negroes, and stocks as owner; for many years previous to 1841, he was owner in his own right to said plantation, negroes, and stock, that is, of so much as were sold in 1841, a list of which will hereafter be filed as exhibit No. 1. But he states the facts to be as follows:— That the property contained in exhibit No. 1, was purchased by John F. Watson,

who is a near relation, (he having married Watson's sister,) and an intimate friend.   By Watson's kindness alone, (he having no family,) he, respondent, has been permitted to remain on the place; but he denies that it was by any arrangement or agreement that the land, negroes, and stock, were sold and purchased in 1841, as charged; denies that Watson's purchases were made for him, or that there was any design between him and Watson to interpose the pretence of title in said Watson, to prevent levies, and hinder and delay complainant.   The purchases made by Watson were made solely on his own responsibility, with his own means, so far as respondent knows, — certainly with no means furnished by respondent, and on no understanding, express or implied, that said purchases were in any way to enure to the benefit of respondent.   Denies that Watson ever purchased any judgments against him, for the use and benefit of respondent, or with means advanced by respondent.   Watson was, in 1841, when the purchases were made, the owner of large and valuable property, and abundantly able to make said purchases without assistance from any one. That there never has at any time been any such arrangement or understanding between Watson and respondent, or any agreement or understanding, whereby this respondent was to be benefited, or his creditors delayed.   Has no knowledge how Watson paid for the judgments alleged in said bill to have been purchased by him, nor does he now remember the sum for which said property sold.   Respondent used no efforts, nor does he believe any were used by others to prevent the property sold from bringing the highest price.    It is untrue that the stock of horses, mules, hogs, cattle, &c., plantation tools, corn, fodder, &c., were not sold at the sale.   All of said articles were sold under the same judgments with the land and negroes, and purchased by Watson.   While respondent remained on said plantation, after the sale, it was with the consent of Watson, and at his request, and he was liable at any time to be required by him to leave.   A portion of the time he acted as agent of said Watson, under written authority so to do, in his absence and in that capacity.   True, respondent did employ overseers, but always referring them to Watson as the sole owner of said

plantation, and every thing on it, and never presuming to con-
clude any definite arrangement without Watson being first
consulted and his consent obtained ; his agency aforesaid being
special, and subject to the approval of Watson.   Respondent
assumed no authority or ownership over any matters connected
with said land and slaves, and if at any time in the absence of
Watson, he made any arrangements with overseers, they were
temporary and subject to Watson's approval, — respondent
informing them that he had no interest, — that they would be
in the employment of Watson, who alone would be responsible
for their wages.   The supervision exercised by respondent in
the special manner aforesaid, was occasioned by the fact that
Watson did not reside on the place, but some twelve or four-
teen miles distant.   Is not informed of the amount received by
Watson from the crops since 1841; whether sufficient to dis-
charge the amount alleged to have been paid by him for the
judgments or not; it is probable the proceeds do exceed such
amount; denies that he has had any interest in the crops grown
since the year 1841, when said Watson purchased.   Denies
that he has ever had promise or expectation of ever enjoying
the benefit of the proceeds of said crops, or said property, or
that there has been any conversation, agreement, or understand-
ing, that respondent was in any way, at any time, to be
benefited by said Watson's purchase.   Watson holds the
property absolutely, divested of all claim, "legal, equitable, or
moral," of respondent.   Watson has never intimated his inten-
tion of reconveying said property to respondent.   The sum it
sold for was the highest price it would command at fair sale,
under execution, and does not believe it could be made to
bring more, at forced sale at that time, under any possible cir-
cumstances.   Denies all fraud and collusion.

Answer of John F. Watson: Says he believes it true as
stated in bill, that complainant recovered judgment.   Believes
Hamer to be in possession of property, but whether his own or
not he knows not.

Does not believe that Murphy at the time of complainant's
judgment had, or has since had, large and valuable estates of
any kind; believes he did not then have, nor now has any

Burke *v.* Murphy et al.

property, except the lot on the Gulf, and debts against one or more, of what amount he knows not; has no knowledge of Murphy's ownership of any other property, or the disposition of it; has no knowledge of any conveyance made by Murphy or Hamer to hinder, delay, or defraud creditors; denies that at the date of complainant's judgment, or since, Murphy has had the plantation and slaves in exhibit A., in possession.

Admits that for some years previous to 1841, Murphy was the owner of property mentioned in schedule A., and other personal property on said plantation, but denies that since the sale of the same in 1841, Murphy has either owned and possessed, controlled or managed said property as his own or any one else's, except as hereinafter stated. Denies that in 1841, or at any other time, by an arrangement and agreement between him and Murphy, the said land and slaves were sold by the sheriff, and purchased by him nominally, but in fact for Murphy; denies that he confederated with any one, or had any design or object of interposing a pretence of title to prevent levies, or to hinder or delay plaintiff, or for any fraudulent purpose. Admits that executions on the Hoopes and Bogart, and the Rymes, use of Collins, judgments, rendered as charged in the bill, were levied on the said plantation and slaves and other personal property therein mentioned. That the sheriff sold the same at public auction, and respondent being the highest and best bidder became the purchaser in good faith. Denies that he was a pretended purchaser, or that he purchased the judgments for the benefit of Murphy; denies that he made any arrangement by which for said judgments he gave his own notes, to be thereafter or at any time paid out of said Murphy's estate, or that he gave any notes that were so paid; denies that said purchases were colorable or for the benefit of Murphy; denies that since said purchases Murphy was, or is the true owner of said property. States that there were on said place, before said sale, a considerable amount of stock, namely, ten or twelve horses, eighty head of sheep, twenty-five head of hogs, one thousand bushels of corn, six yoke of oxen, and other personal property, all of which was levied on and sold under said executions, and purchased in good faith and delivered to respondent, but for which

15 *

there was no deed or bill of sale; admits that said stock was mostly consumed in the cultivation of said plantation, but denies that he did not purchase the same, or did not set up title thereto; denies that Murphy used, enjoyed, and managed the same as his own, or that respondent claimed the whole as his own for the purpose of keeping off creditors; denies that Murphy employed any overseer on said place since the sale, except under the special instructions of respondent; denies that Murphy had the benefit of the property, except so far as he derived a subsistence from the same; denies that he contracted any debt for said Murphy in connection with said property or its sale, nor has he had any pecuniary dealings with him personally, in reference to the same; denies that his title is fraudulent; denies that Murphy has made any crops on said place since the year 1841, save what resulted from the cultivation of the garden. Is not now prepared to say whether the net proceeds of crops have been sufficient up to this time to have paid off both judgments or not. Believes that they were, and has no doubt been applied in part payment of the purchase-money of the judgments, as they were in fact paid out of the common fund of respondent. Has no knowledge of there being any property on said plantation at the time of the sales subject to levy and sale, that was not sold; has no knowledge of any property on said place at the time of said sales that was not sold then, or that has been employed, disposed, or used in any way.

There was no contract, agreement, or private understanding between respondent and Murphy, nor does any exist between them, in regard to said property, or in any way connected with respondent's purchase. Respondent agreed to give the full amount due for the two judgments, and has long since paid the same. Respondent's object in purchasing them was his own profit and advantage. There was no conversation or communication between him and Murphy, nor arrangement about said purchase with any one but the owners, A. W. Putnam and Reuben Collins. Had no arrangement or understanding with Murphy as to what disposition was to be made of the property after paying the amount due on said judgments, nor as to whether respondent was to have the property absolutely, or

whether Murphy was or not to have some interest.   Respondent purchased as aforesaid, on his own account, and for his own use, and intended to dispose of the property as would best subserve his own interest, to hold it or sell it as he thought best, without intending Murphy to have any interest whatever.   Is not now prepared to say certainly whether $12,130 was the fair value of the land and slaves when he bought in January, 1841; believes they were worth some more, as he then bid a larger sum than that.   Denies that the prices were merely nominal; denies that the sales were gotten up between him and Murphy merely to protect the property; denies combination and fraud.

At the time of the sheriff's sales, and for a long time before, he and Murphy had no friendly intercourse in reference to business transactions.   Never thought of purchasing the judgments until the 16th December, 1840, when Putnam proposed to sell his judgment, receiving part in cash, the balance in notes.   The cash was paid and notes executed, which were afterwards secured by deed of trust.

On the —— day of January, 1841, when the first sale was about to take place, respondent purchased Collins's judgment for respondent's notes at eight per cent.

At each of the sales the fullest competition was afforded. No exertions whatever were used to prevent bidding, or to depreciate the property.   Respondent intended to bid and buy, if he could, at a reasonable price, but if it should bring a very high price he intended to let others bid, and receive the proceeds of the sale.   After the purchases, he took sole charge, and for his own use; permitted Murphy's family (Murphy's wife being his sister) to live in the house, and derive a subsistence from the place; but Murphy neither controlled nor possessed any part of the plantation, except so far as specially authorized to superintend a few matters in special cases.

Murphy resided and subsisted there at the sufferance and on the means of respondent.   Respondent generally shipped the cotton to the house of complainant, and as he also shipped the cotton made on his other plantations together with the cotton made on that one, as a general rule it is not in his power to

furnish an accurate statement of the amount of the crops raised on said place, or of the value of the same.

*W. Yerger* for appellants.

For the appellants it is insisted that the decree of the chancellor should be reversed; because the evidence in the record abundantly shows that the purchase by Watson of Murphy's property was not *bonâ fide*, but that the same was made upon the secret confidence and trust, that it should enure to the benefit of Murphy and his family.

Since the decision in *Twine's case*, 2 Coke, pt. 3, 80, 81, the principle has been universally recognized in the English and American courts, that no valid sale of a debtor's property can be made, unless the sale be made not only upon an adequate consideration, but *bonâ fide;* and the least fraudulent or illegal intention between the parties will vitiate the whole transaction. 7 Pick. R. 74.

Whenever a sale of a debtor's goods is coupled with a trust for the benefit of the debtor or his family, such sale is not deemed *bonâ fide*, but is fraudulent and void as to creditors, although the sale be made on an adequate consideration. *Twine's case*, 2 Coke, pt. 3, 80, 81; 1 Hopk. R. 373; 2 Penn. R. 84; 11 Wend. R. 87; 2 Pick. R. 129; 2 Kent, Com. 535; 5 Cow. 547; 7 S. & M. 394; 8 Ib. 306; 13 Ib. 349.

Although the forms of the law be used, and the purchase be made under an execution, no change in the principles affecting it are thereby made. The question still remains one of intention, and unless that be *bonâ fide*, the sale is void. *Stovall* v. *Farm. & M. Bank*, 8 S. & M. 306; *Trimble* v. *Turner*, 13 S. & M. 249.

Applying these well-known and uncontroverted rules to this case, I think the evidence clearly shows that Watson's purchase cannot be sustained against the creditors of Murphy.

The following facts are shown in the pleadings and proof. They establish, beyond a doubt, that Watson's purchase was made for the benefit of Murphy and his family, and on the secret trust, that when the price Watson agreed to pay to Put-

Burke *v.* Murphy et al.

nam and Collins for their judgments against Murphy should be paid, the property should be held for the use of Murphy.

1. Watson was the brother-in-law of Murphy. He met Putnam at the house of Murphy, and there made an arrangement with him to purchase, upon a credit, a judgment against Murphy.

2. This judgment was rendered in 1837; Watson's purchase of it was made in December, 1840; during that time Putnam had indulged Murphy, but as soon as Watson, the brother-in-law, became the owner of it, he directed an immediate levy and sale of all his brother-in-law's property, and became the purchaser of the whole of it, at very low prices.

3. Murphy was a party to one of the notes given by Watson to Putnam for the purchase of the judgment, thus enabling Watson to control the judgment and execution, by virtue of which the whole of his property was sold and purchased by Watson at a price greatly less than its value.

4. Watson ordered the sale of Murphy's property by virtue of the execution acquired under the foregoing circumstances, to be made for gold and silver at a period of time when, as is historically known, there was an entire destitution of gold and silver in the State. A sale of property for gold and silver at that time, was never demanded by the most heartless and relentless creditors; as it was well known that property so sold would never command a price at all proportioned to its value.

5. Murphy had the right to claim the benefit of the valuation law, in order to prevent a sacrifice of his property; this he did not do, but at a sale of his whole estate, ordered by his brother-in-law, for gold and silver, by virtue of an execution which he had bought on a credit in Murphy's own house, and on one of the notes given for which Murphy was himself a party, he stood present at the sale, evincing no distress, uttering no complaint, seemingly as unconcerned as any one else; while his brother-in-law, if the sale was *bonâ fide*, was reducing his family and himself to beggary, by the most relentless exercise of his rights as a creditor, obtained under such extraordinary circumstances.

6. Parties who were then present, and wished to bid at the

sale of the property, were induced not to bid, at the request of Watson; and did not bid, because they believed, in doing so, they would interfere with the previous arrangements made between Watson and Murphy. This is shown by the testimony of Roach and Tarpley.

7. The personal property was sold on the 18th January, 1841; the tract of land was not sold till 1st March following; the whole of the personal property, bought by Watson, was immediately taken back by Murphy to his plantation, where they have remained ever since. Murphy and family, after Watson's purchase of the plantation, continued to reside there until this bill was filed, exercising acts of ownership over it, with the full knowledge of Watson; such as employing and discharging overseers, directing the manner in which the crop should be pitched and cultivated, what portion of the land should be put in corn and what in cotton, and maintaining his family out of the proceeds of the place.

8. Although it is pretended that every thing Murphy had was sold, and he left entirely destitute, and a pensioner on Watson's bounty, yet we find he was able to keep his house at the Bay for a summer resort, and to send his children off from home to college, for the purpose of being educated; thereby incurring expenses which he could have paid in no other way than by the proceeds of the property which Watson pretended to have bought.

9. More property was sold, under the executions controlled by Watson, than was necessary to pay them; the proceeds of these sales, amounting to nearly $700 or thereabouts, were not paid over by Watson to Murphy, and there is no way to account for Murphy's permitting Watson to retain this sum of money than that the sales were really nominal, Watson's purchases in reality only fictions, and the property still to continue for the benefit of Murphy and family in the name of Watson.

*F. Anderson,* on the same side, argued the case orally, and referred to the following authorities as applicable to the case:—

The principles of law applicable are very simple, and lie

Burke *v.* Murphy et al.

within a very small compass. Without discussing them at large, we will content ourselves by referring to *Taylor* v. *Eckford*, 11 S. & M. 21; *Garland* v. *Chambers*, Ib. 337; *Farmers Bank* v. *Douglass*, Ib. 467; *Foster* v. *Pugh*, 12 Ib. 416; *Trimble* *Turner*, 13 Ib. 348; *Stovall* v. *Farmers and Merchants Bank of Memphis*, 8 Ib. 306; to which we ask attention, and especially to the cases in 8 and 13 S. & M.; 24 Cushm. 137–139; Story, Eq. 109.

*A. Burwell*, on the same side, argued the case.

*Geo. L. Potter*, for appellees,

Argued the case, and the following are some of the points made by him in argument:—

It may be said that we cannot gainsay the returns on the executions under which the sales were made; but we have nothing to do with them. Our title depends on the execution and sale, and not upon the returns. And the rule is clear, that a purchaser is not bound or precluded by them. *Wheaton* v. *Sexton*, 4 Wheat. 506; *Kane* v. *Sternbergh*, 1 Johns. Cas. 153; and cases cited in 3 Cowen & Hill; Phil. Ev. 1094, 1095.

As to sales made under judgment of Hoopes & Bogart, the slaves were sold 18th January, 1841. Afterward, on 3d May, a lot in Utica was sold. They prove that this lot sold very low, but the proofs showing why property then sold so low have been referred to, and they apply here. Moreover, this lot is not in controversy; the bill does not refer to it at all; and if there were objections to this sale, they afford no argument against the prior sales of the slaves and plantation.

The like remarks apply to a half section afterward sold.

But, they say again, there was fraud, because the slave Ann is named in the deed of trust from Watson to Putnam, annexed to his deposition; and Ann was not sold till 5th April. We have commented on the mistake in that return which includes Ann, and have suggested that some of the property was probably sold under the other judgment; but suppose it was not. That deed of trust describes the slaves as sold the 18th January, the day the mass of the slaves were in fact sold, at sheriff's

sale, under judgment of Hoopes & Bogart, and refers to a printed notice of that sale. Now this may have been the fact, as we have suggested; but if not, then the mistake was natural; for the names were evidently copied from that printed notice. The argument is, that the deed of trust was made in January, and Ann not sold until April, under the other judgment; but this deed was not acknowledged till 5th April, and Watson then owned Ann. Putnam says that this deed was first delivered to him at·Nashville, through mail, after it was recorded. That he drew the deed and sent it to Watson, and in drawing it, I suppose he took it for granted, if he did not know, that Watson had purchased all the slaves; it is clear he knew he had purchased most of them. If there was a mistake in the deed, as to the judgment under·which Ann was sold, it was immaterial, and there was no occasion to correct it.

That complainant's judgment was rendered the 20th June, 1845, and was not enrolled till 22d May, 1849. During all that interval Watson held the property as owner, and the judgment was no lien upon it. It is a settled rule that possession for the time limited to sue for personalty, vests a complete title, even in cases of fraud. This court has recognized the rule against judgment creditors having no lien. *Claughton* v. *Black*, 2 Cushm. 185.

The defendant might insist on his title by possession, but has not done so. He is confident of the justice of his cause, and relies only upon its merits. The argument for complainant is, that Watson was guilty of gross fraud, and that his answer is false. Can they explain how it was and why it was, if he be such a man, that he did not rely on the law of limitations?

We admit that Watson was kind to his kinsman; that he gave him food and shelter, a horse to ride, and necessary comforts; and that admission imports no fraud. On the contrary, we should feel the case might, in fact, be against us, had Watson acted as complainant seems to insist that he should. The property was his own, and he might, as he pleased, retain or give it away.

All fraud is denied, none is proven, and the law implies none from the facts in the case. Even if Murphy had retained pos-

session, that would not raise an inference of fraud, since Watson purchased at a public sale. *Garland* v. *Chambers*, 11 S. & M. 342; *Foster* v. *Pugh*, 12 S. & M. 424; *Ewing* v. *Cargill*, 13 Ib. 84.

The minute circumstances relied on by complainant, do not even tend to show fraud; much less to countervail the positive denials of the answers. As to the intent with which Watson purchased, see *Bickley* v. *Norris*, 2 Brev. 254.

I have said that the bill is insufficient to entitle complainant to be heard upon many of the points now insisted on; and think it plain that it does not claim to avoid the sales as being unfair, because excessive, or because of low prices, or preventing bidders, &c., or because Watson purchased for the children of Murphy, &c. It is charged that the judgments and property were bought for Murphy, and that he held and used it. The other charges relating to this point are these : —

1. That, under an arrangement between Murphy and Watson, the property was sold nominally to Watson, for Murphy, with intent to hinder and delay creditors, &c.

2. That said purchases "were colorable merely, and were in fact made by and for said Murphy."

3. That the bids were nominal, and the sales were got up and managed by Murphy and Watson, to get the property for Murphy.

4. That complainant is prevented from levying, by the false and fraudulent claim of Watson.

Now what do these amount to? The first avers that Watson was nominal bidder, and Murphy the real party. The second avers, that the sales were " colorable," and the pleader immediately explains his meaning by adding that the purchases were made " by and for said Murphy." The third avers that the bids were " nominal; " this only means that Watson was bidder for Murphy ; precisely as the pleader had before averred that the property was sold " nominally " to Watson, but for Murphy. It is also averred that they got up and managed the sales for the benefit of Murphy ; this charge will not let in the proof, as it contains no pretence of unfair arts, used at the sale to dissuade bidders, or depreciate prices, &c. The fourth is a

mere inference from the previous charges, and obviously relates to the statement that Watson purchased and held for Murphy. That such general charges are insufficient, see Story, Eq. Pl. p. 275, § 251; *Jasper* v. *Hamilton*, 3 Dana, 280; *Elton* v. *Blanchard*, 2 Scam. 420.

*T. J.* and *F. A. R. Wharton*, on the same side, argued the case, and among other points, made the following: —

As to the legal effect of the objection drawn from the manner in which the returns on the executions are said to be made, before taking issue on the point of fact that they are so made, we maintain, and the authorities very clearly sustain us, that our title derived from the sales under the executions, are in no degree dependent upon the returns or the executing. In the language of the decisions in New York, the purchaser need show no return, nor will it affect him though the return made be incorrect, irregular, or insufficient. It is enough for him that the officer had authority to sell, and did sell to him and execute a deed. *Jackson, ex dem. Kane* v. *Stormberg*, 1 J. C. R. 153.

A purchaser may use the return in deraignment of title, however, and though it do not particularly describe the lands, they may be identified by parol evidence. *Ten Eyeck* v. *Walker*, 4 Wend. 462. The same point has been decided in the same way by the supreme court of the United States. *Wheaton v. Sexton*, 4 Wheat. R. 503, 506. The court there say, "the purchaser depends on the judgment, the levy, and the deed. All other questions are between the parties to judgment and the marshal. Whether the marshal sells before or after the return day, makes a correct return, or any return at all to the writ, is immaterial to the purchaser, provided the writ was duly issued and the levy made before the return." So in Tennessee, it has been held that the purchaser's title cannot be made to depend upon the return. The court cite the above cases from 1 J. C. and 4 Wheat. R., and adopt the principles there laid down to their full extent. *Mitchell* v. *Leipe*, 8 Yerg. R. 179.

Where the answer is responsive to the bill, it is evidence for the defendant, and is conclusive in his favor, unless disproved by two witnesses, or by one witness and strong corroborating cir-

cumstances. 1 Paige, R. 239; 1 McCord, Eq. R. 434; 2 Ib. 102; 1 Dess. Eq. R. (S. C.) 459.

Putnam is clearly mistaken in saying that Murphy paid $1,000. There is no credit in the judgment or execution for it. He refers, doubtless, to the payment of upwards of $1,600 made by Jones; there is a credit for that on the execution.

On the point of supposed possession by Murphy, I refer the court to *Andrews & Brothers* v. *Jones et al.*, 10 Ala. R. 400; also to *Creagh* v. *Savage*, 14 Ala. R. 458. I invite the particular attention of the court to *Parkhurst* v. *McGraw*, 24 Miss. R. 134; *Hall* v. *Thompson*, 1 S. & M. 490.

Mr. Justice HANDY delivered the opinion of the court.

This was a bill filed in the superior court of chancery, by the appellant, a judgment creditor of the appellee Murphy, to set aside certain purchases of the property of Murphy, made by the appellee Watson, and to subject the property to the payment of the appellant's judgment.

The bill charges, in substance, that in the year 1841, Murphy was the owner of a plantation of about 1,500 acres of land, about forty slaves, stock, &c., and being much in debt, by an arrangement between him and Watson, his brother-in-law, the lands and other property were sold under two executions, which Watson had got the control of, and which he purchased on time, and paid for out of the proceeds of the property, and at the sheriff's sales; that Watson purchased the property nominally for himself, but really for the benefit of Murphy, who has remained in the possession and use of the property ever since. The purchases of the executions and of the property are charged to have been colorable and fraudulent as to the creditors of Murphy, and made for his benefit, and really with his means, in order to cover up his property and prevent its being subject to execution.

The answer of Watson denies all the fraud charged as to the purchases of the judgments and of the property, and claims to hold the property as a purchaser in good faith, and he denies all the particulars of fraud charged, and especially that there was

any understanding whatever that the purchase was for Murphy's benefit. The answer of Murphy is to the same effect.

Upon the final hearing on the pleadings and evidence, the chancellor dismissed the bill; and this appeal was thereupon taken.

This case has been very fully and ably presented on both sides by the arguments of counsel at the bar, which have aided us much in examining the particulars of the evidence contained in the voluminous record. The merits of the case depend rather upon the facts and conclusions to be drawn from them, than upon contested principles of law ; and though the points of fact are numerous, and many minute details have been considered in argument, we do not think it necessary to examine all those particulars, and will notice only the more striking features which, in our judgment, fix the legal character of the transactions in question. We will proceed to consider such points, and the legal conclusions arising from them.

It is shown by the record, that in December, 1840, the appellee, Murphy, was much involved in debt, and that there were two judgments against him, one held by A. W. Putnam, for $11,974.24, with interest from June, 1837, subject to a credit of about $2,600 ; and the other held by Reuben Collins, for $1,655, with interest from October, 1840 ; and that he was then indebted to the appellant in the sum for which a judgment was afterwards rendered against him for $11,907.67. Watson was his brother-in-law, and Murphy was then the owner and in possession of a plantation of 1,518 acres of land, about forty slaves, farming utensils, horses, sheep, and cattle, and other articles usual on such a cotton plantation ; one thousand bushels of corn, household and kitchen furniture, &c. In December, 1840, Putnam and Watson met at Murphy's house, which was some twelve miles from Watson's residence, and Watson purchased the judgment of Putnam, paying him about $2,000 in cash, and giving his individual notes, one for $4,100, due twelve months after date, and another for $4,428, due two years after date, which notes were afterwards secured by a deed of trust upon the slaves purchased under the judgment; also

Burke *v.* Murphy et al.

another note signed by Watson and M. Watson and Murphy, payable at the Commercial Bank of Natchez, twelve months after date, for about $4,000. The money in payment of these notes was received from Watson, but was not paid in full until 1846. The note payable at the Natchez bank was discounted there, and the name of Murphy is said to have been put upon it to comply with the rules of the bank, requiring several names on paper. It is also stated that the transfer of the judgment was suggested by Putnam, and that his reason for wishing to sell it was, that he feared he might lose the debt, as he had heard of persons running off their property, as Murphy was but a surety, and otherwise in debt, and he was getting some cash and securing the debt by the transfer. This is the account of the matter given by the witness Putnam in behalf of the appellees. But in several respects, his statements are inexplicable consistently with facts appearing in the case. 1st. It appears that the money paid and secured to him considerably exceeded the amount of money due on the judgment, the principal and interest, on which at the time of the transfer did not exceed $14,800, without taking into consideration the credits upon it. He states that there was paid by Murphy $1,000, but says nothing about the credit of $1,612, entered previously by himself upon the execution. These credits would reduce the amount to about $12,000. Yet the sum paid and secured by Watson appears to have been about $14,000 at the time of the transfer, according to his statement. 2d. He states that only the note which had Murphy's name upon it was payable at the Natchez bank. But it appears by the deed of trust made to him by Watson, that the two other notes were made payable in that bank. These circumstances show that this witness may be at fault in his recollection of the circumstances of the transaction. But, 3d. It is shown by the testimony of the officers of the bank, that no such note as that stated by the witness to have been discounted in that bank, was ever discounted there; but on the contrary, that a note for $3,000 was discounted in the bank on the 3d March, 1840, for the benefit of Murphy, the avails of which were paid to the witness, and that no other note with the name of Watson, Murphy, and Putnam upon

16*

it appears by the books of the bank ever to have been discount-ed, except as a renewal of the note discounted in March, 1840.

This witness does not positively state that the note discounted in bank was given in December, 1840 ; and if such a construc-tion be given to his testimony, it is manifest that he was mis-taken, for it is inconsistent with the books of the bank. But he is clear that a note of the parties was discounted in the bank at Natchez, and that it formed a part of the consideration given for the purchase of the judgment by Watson. It fully appears that no other such note was discounted but that given in March, 1840, which was signed by Murphy and its proceeds applied to his benefit. He was a party to that discount, and yet he does not undertake to give any explanation in relation to it; and if it had been applied to any other purpose than the purchase of the judgment, it is to be presumed that he would have explained it. It was certainly not applied to the part pay-ment of the judgment, for no credit is given on account of it. Taking the testimony of this witness, then, in connection with the evidence derived from the books of the bank, and reconcil-ing them as far as can be, the conclusion is not to be avoided that the proceeds of the discount obtained for the benefit of Murphy in March, 1840, constituted a part of the consideration of the transfer of the judgment by Putnam to Watson. Mur-phy thus supplied the means in part by which the judgment was purchased, and the transfer and the proceedings had under it cannot be permitted to stand as a protection against the claims of his creditors. The law condemns it as fraudulent in an essential part of it, and if fraudulent in part, it is void *in toto* as to the creditors of Murphy. For that reason, Watson can claim no protection by reason of his having paid the cash paid when the transfer of the judgment was made, or by his subse-quent payment of the debt contracted by Watson on the note of the 3d March, 1840 ; because the consideration for the trans-fer was in part the money raised by Murphy and paid to Put-nam. If that consideration was vicious at the time, it could not be rendered valid by his subsequent payment of the money to the party who furnished it to Murphy.

Much less can he claim protection on account of his subse-

Burke *v.* Murphy et al.

quent payment of the two notes secured by the deed of trust. He admits that he has had the products of the property since his purchase in January, 1841, and it sufficiently appears that, before the final payment of the debts, the crops were amply equal to the payment of all that Watson paid on account of the purchase of the judgment. Thus the money has been substantially paid by the property of Murphy, and if the transaction is condemned under the force of legal rules, it cannot receive a more favorable consideration in a court of equity on account of any hardship occasioned to Watson, for loss of money paid by him.

Many other reasons, having much force, have been urged, to show that the purchase of the property was fraudulent. But the view we have taken of the foundation upon which the title of Watson rests renders it unnecessary to give particular consideration to these reasons, so far as they are applicable to the sale under the execution obtained from Putnam.

As to the validity of the sale of the land and other property under the execution obtained from Collins, we think it must be considered as a part of the same transaction as the purchase of the slaves, and made with the same object. The purchase of the judgment was made about the same time as the other, on credit, but for its full amount bearing interest, the products of the place being sufficient to pay that as well as the other debts contracted, Murphy remaining on the place, the arrangement that Collins should run the land up to a certain price at the sale, the low price at which the land sold, $500, and the fact that the land and other property sold under the execution were sold for an amount exceeding considerably the money due on the execution, and that all the property Murphy had was thereby sold and purchased by Watson; all these circumstances tend to cast suspicion upon the sale. When it is considered that the sale of this property was intimately connected with the previous sale, and was necessary to carry out the purpose intended by that sale, these suspicious circumstances must force the mind to the conclusion that this sale partakes of the same vicious character as the former one, and must be held fraudulent in law, and void as to Murphy's creditors.

We have viewed this transaction, as we are bound to do, through the medium of the rules which the law has prescribed, not with reference to any motives of benevolence which may have actuated the purchaser of this property towards his relatives. However praiseworthy such motives may have been, in point of private feeling, they are such as the law condemns, and we but pronounce its judgment, in declaring the purchases void as to the creditors of Murphy.

The decree is reversed, and a decree ordered for the appellant, according to the prayer of the bill.

The appellees, by their counsel, filed a petition for a reargument of this cause; but the court refused to grant a reargument.