## GREELEY v. WINSOR *et al.*

1. In a former opinion in this case, 1 S. D. 117, (45 N. W. Rep. 325) it was *held* that a chattel mortgage which, by its terms, permitted the mortgagor to sell the mortgaged property for his own benefit, is presumptively fraudulent as to creditors of the mortgagor, and that such a mortgage, containing the power of sale as to stock of goods, but not as to furniture and fixtures, is presumptively invalid as to both; and this opinion is adhered to.

2. *Held, further,* that the act of the territorial legislature of 1887 authorizing an independent appeal from an order of the district court sustaining or overruling a demurrer is not in conflict with Section 1869 of the organic act, which provides that "writs of error, bills of exceptions, and appeals shall be allowed in all cases from the final decisions of the district courts to the supreme court of all the territories, respectively, under such regulations as may be prescribed by law."

3. Such section is not the source of the general appellate power of the

supreme court, and is not intended to limit its jurisdiction to cases therein named, but does qualify the preceding section 1866, which declares that such appellate jurisdiction "shall be limited by law," so that no law shall so limit or prescribe its jurisdiction as not to allow writs of error, bills of exceptions, and appeals in all cases from the final decisions of the district courts.

(Syllabus by the court. Argued Oct. 14, 1890.   Opinion filed March 4, 1891.)

Appeal from district court, Minnehaha county. Hon. FRANK R. AIKENS, Judge.   Opinion upon rehearing.

*Wynn & Nock,* for respondent and petitioner for the rehearing.

The court erred in holding that because the chattel mortgage lease in controversy was *prima facie* fraudulent as to a portion of the property because permission was given to the mortgagor to sell such property, that it was also void as to the furniture and fixtures that were not included in the permission to sell; that because fraudulent in part, it was fraudulent *in toto.* Jones on Chat. Mortgages, § 351; Kent's Com., §§ 467, 468; Lumber Co. v. Court, 35 Mich. 254; Barrens v. Capen, 11 Cush. 37; Rand v. Mather. Id. 1; Parish v. Stone, 14 Pick. 208, Shaw v Carpenter, 41 Am. R. 837; Davenport v. Faulke, 34 Am. R. 265; In re, Kabley 2 Biss. 383; Barnet v. Fergus, 51 Ill. 352; Donnell v. Byem, 69 Mo. 468; State v. Tosker, 31 Mo. 445; In re, Kirkbride, 5 Dill. 116; Lund v. Fletcher, 43 Am. R. 270.

The appeal in this case was taken before the organization of the state.   The order overruling the demurrer from which the defendants appealed in this case was not an appealable order under the practice in the territorial courts. § 1879, Rev. Stat. of 1874; White v. Railroad, 41 N. W. 730; Harris Man'f'g Co. v. Walsh, 2 Dak. 41; Surber Bank v. Carroll, 1 S. D. 1, 44 N. W. 723.

*Winsor & Kittredge,* for appellants.

The instrument in question being tainted with fraud as to part of the property included therein is void *in toto.* §§ 4656, 4659, Comp. Laws; Horton v. Williams, 21 Minn. 187; Herman, Chat. Mortgages, p. 257; Goodrich v. Downs, 6 Hill 438; Jack-

son v. Skinner, 6 Wend. 415; Denny v. Dana, 2 Cush. 160; Wilson v. Voight. 13 Pac. 726; United States v. Amistad, 15 Pet. 518; Wallach v. Wyler, 28 Kan. 138; Winstead v. Hulner, 32 Kan. 568; Brigham v. Potter, 14 Gray 522; Wheeden v. Hawes, 10 Conn. 50; Hungen v. Hachemeister, 114 N. Y. 566; Divver v. McLaughlin, 2. Wend. 596.

Respondent's mortgage was taken for rent to become due and was in the nature of a mortgage for future advances, and mortgages taken on the same property for existing debts took precedence over it, except for rent accrued before the taking of the subsequent mortgages. Herman Chat. Mortgages, 114, 115; Bank of Montgomery's App. 36 Pa. 170; Bank of Commerce App. 44 Pa. 443; Barnard v. Moor, 8 Allen 277; Craig v. Tappin, 2 Sandf. Chan. 150; Spader v. Lawler, 17 O, 371; Fry v. Bank, 11 Ill. 367; Jones Chat. Mortgages, § 97; Spear v. Skinner, 35 Ill. 282; Preble v. Conger, 66 Ill. 370; Brinkerhoff v. Marvin, 5 Jackson's Char. 320.

KELLAM, J. This case was argued and decided at a former term. See 45 N. W. Rep. 325. The principal questions presented and argued were: (1) The force and effect of the provisions in the lease for a lien for rent, as against the mortgage creditors, considered in connection with other provisions of the lease; and (2) the jurisdiction of the territorial supreme court, to which this appeal was originally taken, to entertain an appeal from an order overruling a demurrer. The second question was not considered in the opinion of the court; and on that account, more particularly, though not exclusively, a reargument of the case was allowed. We held that the stipulation for a lien for rent upon the goods, fixtures, and furniture was, in effect, a chattel mortgage; and that the further provision allowing the mortgagor to make sales "in the usual course of retail trade," without any proviso or agreement as to the application of the proceeds, or any part thereof, was a stipulated permission to sell for his own use; and that while such permission did not, in terms, extend to the furniture and fixtures, its legal effect was, as against other creditors, to make such mortgage presumptively fraudulent, not only as to the

goods, but as to the furniture and fixtures. It is this holding, that the presumption of invalidity applies to the entire mortgage, and tends to defeat the lien upon the furniture and fixtures, as well as upon the goods, of which respondent complains. In our former opinion we recognized the fact that upon this question different courts had reached directly inconsistent conclusions; but the earnestness and ability with which the contention is again presented induces us briefly to review the question.

Referring to respondent's brief, we do not think Jones, in his work on Chattel Mortgages, intends or undertakes to state the rule, adverse to our former holding, as an established one. He says it "is held," and refers to cases in support from four different states. In the immediately preceding section (350) he says, "In New York and one or two other states" the contrary rule prevails, in support of which he also refers to cases from four different states. In a foot-note to Section 351, he quotes from the opinion of Judge DILLON in the Kirkbride Case, 5 Dill. 116, and the same is reproduced in respondent's brief; but this must not be taken as an expression of this learned judge's opinion of what the general law is upon this subject. The case was from Missouri, and the opinion simply states that the courts of that state had settled the question for that jurisdiction, and, in accordance with the established rule in the federal courts, the holding of the state court was followed. The American & English Encyclopædia of Law (volume 3, p. 187) says: "A mortgage or personal chattels which, under the statutes, is fraudulent and void as to a part of the chattels covered by it, (*e. g.* as being intended to delay and defraud creditors.) is void altogether;" but in the foot-notes cites two cases for, and two against, the proposition. So, in 2 Wait, Act. & Def. p. 191, we find: "It has been held that a mortgage of chattels which is void as to a part of the chattels covered by it, as being given to hinder, delay, and defraud creditors, is void as to the whole;" but recognizes a contrary holding in State v. Tasker, 31 Mo. 445. Wait on Fraudulent Conveyances (section 194) says: "We shall see, presently, that as a general

rule a transaction void in part for any cause is entirely void;" and cites in illustration Russell v. Winne, 37 N. Y. 591. And again, in Section 434: "And as a general rule a deed which is fraudulent in part as to creditors will be declared void *in toto.*" In Bump on Fraudulent Conveyances (page 486) it is said: "If a mortgage is made with the intent to secure a part of the property to the mortgagee, and to cover the residue for the use of the debtor, it is void as to the whole." "A fraudulent stipulation in a written instrument vitiates the entire instrument." The fact is it is beyond the power or the province of any textwriter to state what the law really is on this particular question, for the courts are in plain and notorious disagreement upon the subject; and we think the authorities, so far as numbers go, do not largely preponderate either way.

But respondent insists that under our statute the fraudulent character of the mortgage as to any part of the property could not be determined by the court on demurrer, as a matter of law. Section 4656, Comp. Laws, so far as it relates to the facts or the question under consideration, reads thus: "Every transfer of property or charge thereon made * * * with intent to delay or defraud any creditor or other person of his demands is void against all creditors of the debtor." By Section 4659 the question of fraudulent intent is declared to be one of fact, and not of law. This last section, making fraudulent intent a question of fact, is not peculiar to this jurisdiction. It is the same in New York, Wisconsin, Minnesota, Indiana, Michigan, Nebraska, California, and perhaps other states; and there is, I think, nearly an unbroken uniformity in holding that such provision, in the language of DAVIS, J., in stating the law as held by the Indiana supreme court, "applies to cases of actual or medited and intentional fraud, and is not applicable to written instruments which the law adjudges to be fraudulent on their face, and consequently void." Robinson v. Elliott, 22 Wall. 513. And the courts of these states—Michigan excepted —have not hesitated to declare void, presumptively or conclusively, as a matter of law, instruments which themselves exhibit the fraudulent intent. Edgell v. Hart, 9 N. Y. 213;

Russell v. Winne, 37 N. Y. 591; Coleman v. Burr, 93 N. Y. 31; Place v. Langworthy, 13 Wis. 629; Steinart v. Deuster, 23 Wis. 136; Blakeslee v. Rosman, 43 Wis. 116; Williams v. Evans, 6 Neb. 216; Horton v. Williams, 21 Minn. 187; Jenners v. Doe, 9 Ind. 461.

We come again to the old question, is the security clause in the lease, which it is conceded should be treated a chattel mortgage, presumptively fraudulent as to furniture and fixtures, as well as to the goods, the stipulation that the mortgagor might sell in the usual course of trade applying only to the goods. Upon what theory does the law declare the mortgage of these goods invalid? The answer is that it was given with a fraudulent intent,—not, of course, morally, but legally fraudulent,—and that because its natural and obvious effect is to hinder and delay other creditors of the mortgagor. When respondent took his mortgage, and therein stipulated that the mortgagor might dispose of a part of the mortgaged property for his own benefit, it was an agreement in advance with the mortgagor that he would not look to nor depend upon such property for his security. The apparent effort and effect was to make it a mortgage as the public, but not as between themthemselves. Under such an agreement the mortgagor might dispose of the bulk of the property, in terms covered by the mortgage, and convert the proceeds to his own use; but if, while such conversion was going on, a creditor should seize any part of it, the mortgagee would stand ready with his mortgage to protect it. The mortgage could not have been intended to, nor did it, give the mortgagee any certain or abiding lien on the goods for the payment of his claim; for it distinctly provided that the goods, apparently pledged for such purpose, might be sold at the will of the mortgagor, regardless of payment made or contemplated, precisely as though there were no mortgage. This, we say, makes the mortgage presumptively fraudulent, because its natural and legitimate effect is a fraud upon other creditors; and, as every man is presumed to intend the obvious result of his own acts, the law presumes that the resulting mischief was contemplated. It is well known that in

many of the states such a mortgage is held, in law, conclusively fraudulent; but, conscious that there are may cases where kindred provisions, apparently vicious, are not fraudulent in fact, —provisions whose fraudulent complexion may be changed by explanatory and affirmative evidence of good faith,—we think the rule best calculated to work justly in the most cases, and unjustly in the fewest, is that such mortgages should be held presumptively fraudulent only, leaving in every case the suspicion which attaches to such a mortgage to be overcome and removed, if it can be, by evidence showing the entire *bona fides* of the parties in the transaction towards other creditors. But, having adopted such rule, there is the greater reason for making it apply, in a case tike this, to the mortgage *in toto;* as well to the furniture and fixtures as to the goods. If the mortgage were held conclusively fraudulent, it would be, as to other creditors, as though there were no mortgage, and it would present no shield to protect the property from their attack; but if the mortgage is only presumptively invalid, and may in fact be good, creditors may only approach such property at their peril. The parties to the instrument are the only ones who can know in advance whether it is in fact fraudulent or not. If it is, it is because it was so intended, and in that case no part of it ought to be saved; but if it was in fact given in good faith, and under such circumstances as to purge it of the suspicion of fraud which the law raises, the presumption against its validity may be overcome, and thus the entire mortgage held good. The unfairness of such an instrument towards other creditors is further manifest in this: Its possible validity renders it a protecting shelter for property pledged as security in form, but not in fact. The mortgage assumes to create a lien, both upon goods and furniture and fixtures, but authorizes the mortgager, at his pleasure, to destroy it as to the goods. This fact seems quite inconsistent with the thought that the goods were to constitute security to the mortgagee. A legitimate, if not the inevitable, inference is that the goods were to be mortgaged, if necessary to protect them from creditors; otherwise, the security should be upon the furniture and fixtures only. Such

an instrument gives a protection and an advantage to the mortgage debtor, to which, in fairness to his creditors generally, he is not entitled, and casts suspicion upon the entire instrument.

For these reasons, and others expressed in our former opinion, we think the mortgage, if fraudulent at all, is so altogether, and that the provision allowing the mortgagor to make sales for his own benefit renders it *prima facie* so. We think this holding places both mortgagor and mortgagee just where they ought to be. If the mortgage was a device to protect the mortgage debtor's property, in his own interest, and not as security for the mortgage debt, it ought not to be saved, even as to furniture and fixtures; but if the transaction is shown to be an open, fair, and honest one, and innocent of the bad intent which the law presumes from the facts exhibited by the instrument itself, then the mortgage ought to be held good as to all the property covered by it. The burden is upon the mortgagee. He has voluntarily assumed it by taking a mortgage which, however innocent it may be in fact, is so well adapted to fraudulent uses that the law puts upon him the *onus* of showing that it is not, in fact, what it appears to be. The following are cases, citing but one from the state, which announce the rule which we have adopted. It is just to ourselves, however, to remark that as to two or three of them we have not had access to the state reports which contain the opinions, but have depended upon reference to and quotations from them in other cases. Russell v. Winne, 37 N. Y. 591; Horton v. Williams, 21 Minn. 187; Burke v. Murphy, 27 Miss. 167; Wilson v. Voight, (Colo.) 13 Pac. Rep. 726; Claflin v. Foley, 22 W. Va. 434; Sommerville v. Horton, 4 Yerg. 541· The following are *contra:* State v. Tasker, 31 Mo. 445; Barnet v. Fergus, 51 Ill. 352; Davenport v. Foulke, 68 Ind. 382; Hayes v. Westcott, (Ala.) 8 South. Rep. 337; Lund v. Fletcher, 39 Ark. 325. And these in federal courts, following the rule adopted in the jurisdiction in which the case originated: *In re* Kahley, (Wis.) 2 Biss. 383; *In re* Kirkbride, (Mo.) 5 Dill 116.

The remaining question, and the one not considered in our

former opinion, is as to the jurisdiction of the late territorial supreme court to entertain an appeal from an order overruling a demurrer; this appeal have been taken to said court, and found upon its calendar as it came to us, as the successor of said territorial supreme court. The question involved the proper construction of several sections of the federal statutes, which in part constitute the organic act of the old Territory of Dakota, and in connection therewith an act of the territorial legislature, hereinafter more particularly referred to, and, while no longer of great practical importance generally, it is interesting on account of its character, and necessary to be considered in disposing of this case. It would be a waste of time to discuss the relation of the territorial courts to the congressional legislation which created them, and all discussion of the question now presented must be predicated upon the understanding that all the power and jurisdiction which the territorial supreme court had or could exercise must be found in the federal statutes. In the organization of the Territory of Dakota, congress provided, as in other cases, for a system of courts, which should constitute the judicial department of the government. Section 1907, Rev. St. 1874, provides that the judicial power in * * * Dakota * * * shall be vested in the supreme court, district courts, probate courts, and in justices of the peace." "Sec. 1866. The jurisdiction, both appellate and original, of the courts provided for in Sections 1907 and 1908 [the section last named referring to Arizona only] shall be limited by law." "Sec. 1868. The supreme court and district courts, respectively, of every territory shall possess chancery, as well as common-law, jurisdiction. Sec. 1869. Writs of error, bills of exception, and appeals shall be allowed in all cases from the final decisions of the district courts to the supreme court of all the territories, respectively, under such regulations as may be prescribed by law; but in no case removed to the supreme court shall trial by jury be allowed in that court." These are the provisions of the federal statutes which granted, defined, and limited the powers and jurisdiction of the supreme court of Dakota territory. In 1887 the ter-

ritorial legislature assumed to enact a law providing that an independent appeal might be taken to the supreme court from and order of the district sustaining or overruling a demurrer; and the question now before us is, is such law valid? Repondent contends that it is not, because said Section 1869 limits appeals to "final decisions of the district courts," and an order sustaining or overruling a demurrer is not "a final decision." Prior to the passage of the law of 1887 the supreme court of the territory had given expression to its opinion as to the meaning and force of these sections, and held in Manufacturing Co. v. Walsh, 2 Dak. 41, 3 N. W. Rep. 307, that the effect of said Section 1869 was to limit the appellate jurisdiction of the supreme court to the review of "final decisions of the district courts," and dismissed the appeal, which was from an order sustaining a demurrer to one paragraph of defendant's answer. And the question now presented does not necessarily involve the correctness of that decision; for the court there expressed the opinion that the territorial law then in force was not intended to authorize an independent appeal from an interlocutory order, but that such order might be appealed from and reviewed in conjunction with the appeal from the final judgment. This view prevailing would fully justify the decision upon that ground, and makes the further expression of opinion as to the meaning and effect of said Section 1869 *obiter*. The further expression of opinion was that, if such law was intended to give an independent appeal in such case, it was invalid, because in violation of the organic act. The fact, however, cannot escape our attention that although, as is usual with the learned judge who wrote the opinion, the general question of the force of these sections, beyond the particular question in his opinion necessarily involved, was vigorously discussed, and his conclusions are clearly and concisely stated, its doctrine has not been implicitly adopted, nor its teaching faithfully followed, by legislature, bench, or bar. While, upon such a question, the opinion of the court is paramount to that of the legislature, still the fact remains, for what is it worth, that notwithstanding, and apparently in conflict with, the opinion

expressed in that decision, the legislature very evidently understood that said Section 1869 did not so limit the jurisdiction of the supreme court; for no other view would justify the law of 1887. Nor has the court itself which made the decision consented in other cases to measure its jurisdiction by the views there announced. Smith v. Adams was the title of the Brown county seat contest case, taken to the territorial supreme court on appeal from the decision of the district court on demurrer to the notice of contest. The appeal was not dismissed for want of jurisdiction, but was entertained, heard, and decided on the merits. The opinion of the court is not yet published, but the case was subsequently appealed to the United States supreme court, and the facts sufficiently appear in 130 U. S. 167, 9 Sup. Ct. Rep. 566. Bostwick v. Knight, 5 Dak. 305, 40 N. W. Rep. 344, was an appeal from an interlocutory order. The court dismissed the appeal upon the ground that the order appealed from was a chambers order, and therefore not appealable under the statute, and for the further reason that the record presented no bill of exceptions. The court, in its opinion, puts its dismissal upon these distinct grounds. It would hardly have so disposed of the case upon grounds of practice only, if it had entertained the opinion that the court could have no jurisdiction, under the organic act, to entertain such an appeal. White v. Railway Co., 5 Dak. 508, 41 N. W. Rep. 730, was an appeal from an order of the district court refusing to change the place of trial. The question of the want of jurisdiction, for the very reason now under consideration, was squarely raised and argued by respondent, so that the matter could not have been overlooked; yet the court entertained the appeal, and made a decision upon the merits. These facts are referred to in support of the intimation, already made, that the doctrine of Manufacturing Co. v. Walsh, *supra*, has not been universally acquiesced in.

Bearing upon this discussion, it is a significant fact that these provisions of the federal laws have not been peculiar to Dakota, nor to the more recently organized territories. For many years they have constituted nearly a stereotyped formula

which congress has used to convey, define, and limit the power
and jurisdiction of the territorial courts; and whatever they have
meant as to other territories, they have meant as to Dakota.
The same provisions identically are found in the act of congress
of March, 1849, organizing the Territory of Minnesota. The
legislature of that territory passed a law providing for appeals
from the district to the supreme court on interlocutory orders
and decisions on demurrer. St. Minn. 1851, p. 414, § 7. I
have come across no case in which the consistency of this Minne-
sota statute with the organic act was directly in question, but
its validity was fully recognized by the United States supreme
court in Holcomb v. McKusick, 20 How. 552, an appeal from
an order sustaining a demurrer, in which that court says:
"The statutes of Minnesota have provided for an appeal from
the district to the supreme court on an interlocutory order af-
fecting the merits. It was therefore properly taken to the su-
preme court of the territory." In 1838 the Territory of Iowa
was organized by act of congress, and the jurisdiction of its
courts was defined as in the sections above quoted. A cursory
examination of the territorial supreme court reports shows
that that court did not hesitate to entertain and determine ap-
peals from interlocutory orders and decisions not final. See
Sleeth v. Murphy, 1 Morris 321; Long v. Long, Id. 458; Bank
v. U. S., Id. 482. The last case cited went to the United States
supreme court; and its opinion recognizes the fact that the
judgment appealed from was not final, for it says: "We pre-
sume that the supreme court of the territory awarded the *pro-
cedendo* to the district court in order to enable it to proceed to
final judgment." See Bank v. U. S., 5 How. 213. It is true,
these appeals were dismissed by the United States court on the
ground of want of jurisdiction in that court; but nowhere is it
intimated that the territorial supreme court had not jurisdic-
tion of such cases, but, on the contrary, it was directly affirmed
that they were properly taken there. The courts of Washing-
ton territory depended upon these same sections for their juris-
diction; and yet we find the same condition both as to terri-
torial legislation, and the practice of the courts, Section 446 of

their Code providing for an appeal from an order "when it sustains or overrules a demurrer." The present territories of Utah and Arizona, with courts chartered and controlled by these same provisions, both have territorial statutes authorizing independent appeals from interlocutory orders. Utah, Section 3635, Par. 3, Comp. Laws; Arizona, Section 2785, Comp. Laws. We have not had the facilities, nor is it necessary, to pursue the inquiry further, but we have little doubt the same practice prevailed in other territories under the same conditions; but these instances establish the fact that in none of these territories were the provisions of said Section 1869 regarded as prohibiting the territorial legislatures from providing by law that appeals might be taken from decisions of the district courts that were not "final decisions" in the sense that such decisions "must terminate the litigation between the parties to the suit." They show the further fact that such construction of these federal laws, and the practice under them, which could only be justified by such construction, were well known to and fully acquiesced in by the authorities at Washington. While this long and repeated acquiescence in such construction, and in the acts of the territorial legislatures, and the practice of the courts depending upon it, would not be conclusive as to its correctness, it has much persuasive force, and is in direct line with the remark of Chief Justice CHASE in the Utah case: "In the first place, we observe that the law has received the implied sanction of congress. It was adopted in 1859. It has been in the statute book for more than twelve years. It must have been transmitted to congress soon after it was enacted. * * * The simple disapproval by congress at any time would have annulled it. It is no unreasonable inference, therefore, that it was approved by that body." Clinton v. Englebrecht, 13 Wall. 446.

We think it is hardly permissible to believe that these repeated acts of territorial legislation, and the constant practice of territorial courts, should not have received some notice from some department of the general government, if they constituted plain and open violations of the laws of congress which were

the constituent and organic acts of the territories. Referring again to Sections 1866 and 1868, they provide that the supreme and district courts shall possess chancery, as well as common law jurisdiction, and that such jurisdiction, both appellate and original, shall be limited by law. Here is the active and efficient grant and confirmation of general judicial power to and in these courts,—chancery, common law, original, and appellate. All the jurisdiction which these courts have or had springs from these two sections. Strike out Section 1869, which says that writs of error, bills of exception, and appeals shall be allowed in all cases from the final decisions of the district courts to the supreme court under such regulations as may be prescribed by law, and would anybody doubt that the supreme court, under its general appellate powers, as provided in Sections 1866 and 1868, could entertain an appeal from a final decision of a district court? If so, its appellate jurisdiction as to such cases does not come from said Section 1869. Our view is that the true meaning of Sections 1866 and 1868 is not changed, but emphasized, by reading them together as though the word "but" connected them, and they would then declare that the appellate jurisdiction of the supreme court shall be limited by law, but writs of error, etc., shall be allowed in all cases, etc.; that the office of Section 1869 is neither to directly create, enlarge, or limit such jurisdiction, but does qualify the words, "shall be limited by law," so that no law shall so limit, qualify, or prescribe the appellate jurisdiction of the supreme court as not to allow writs of error and appeals in all cases from the final decisions of the district courts. Erase said Section 1869, and the general appellate power of the supreme court is not taken away, nor the territorial legislature prohibited from limiting or defining it by law, but there is only removed the affirmative requirement that it must extend to the review of final decisions. By Section 1866, such appellate jurisdiction "shall be limited by law." In the organic acts of most of the territories, the expression is, "shall be as limited by law," and the law which may thus limit or prescribe this jurisdiction may be either federal or territorial.

Ferris v. Higley, 20 Wall. 375.   If territorial, it must be within the scope and limits of the acts of congress, and must, under the requirement of Section 1869, allow appeals in all cases from final decisions.   In other words Sections 1866, 1868, and 1907 supply a complete system of courts for the territory, with the general nature and extent of the jurisdiction of each declared by the express terms of the act, or by the terms by which those courts are designated.   The district courts are tribunals of general jurisdiction, both common law and chancery; and the supreme court possesses primarily, and almost exclusively, appellate powers.   These terms import clearly the nature and powers of these courts; and within, and subordinate to, this general investiture of jurisdiction, the territorial legislature may more particularly prescribe and regulate their powers and jurisdiction, but must not so limit or define the jurisdiction of the supreme court as not to allow writs of error, bills of exceptions, and appeals in all cases from the final decisions of the district courts.

Following these views, we hold that the act of the territorial legislature of 1887 authorizing an appeal to the supreme court from an order sustaining or overruling a demurrer did not violate either the letter or spirit of the organic act.   After full consideration, we see no reason for changing our former disposition of this case.